## STATE OF CONNECTICUT *v.* DONALD MISIORSKI
## (SC 15983)

Callahan, C. J., and Borden, Berdon, Katz, Palmer, McDonald and Peters, Js.

Argued February 16—officially released August 17, 1999

*David E. Koskoff*, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom, on the brief, were *John Cronan*, acting state's attorney, and *Louis Luba, Jr.*, assistant state's attorney, for the appellee (state).

*Ann M. Parrent* filed a brief for the Connecticut Civil Liberties Union Foundation as amicus curiae.

*Opinion*

MCDONALD, J. The sole issue in this appeal is whether the office of adult probation has authority to provide members of the public with information concerning a probationer guilty of sexual offenses not enumerated in subsection (a) of General Statutes (Rev. to 1997) § 54-102s.[1] We hold that it has such authority.

[1] General Statutes (Rev. to 1997) § 54-102s, which was applicable when the court rendered judgment sentencing the defendant to probation, provides: "Notification of change of address of sexual offenders on parole or probation. (a) For the purposes of this section, 'sexual offender' means any person convicted of a violation of subdivision (2) of section 53-21, section 53a-70, 53a-70a, 53a-70b, 53a-71, 53a-72a or 53a-72b committed on or after October 1, 1995.

"(b) Any sexual offender who is released from a correctional institution on parole or who is sentenced to a period of probation shall, during the

The following facts are undisputed. On December 17, 1997, the defendant, Donald Misiorski, pleaded, pursuant to a plea bargain, guilty to sexual assault in the fourth degree in violation of General Statutes § 53a-73a,[2] and public indecency in violation of General Stat-

period of such parole or probation and as a condition of such parole or probation, immediately notify his parole officer or probation officer, as the case may be, whenever he changes his residence address. Each parole officer or probation officer who is notified of such change of address shall notify the chief of police of the police department or resident state trooper for the municipality of the new address of the parolee or probationer and any other law enforcement official he deems appropriate.

"(c) Nothing in this section or section 54-102r shall be construed to prohibit a parole officer or probation officer acting in the performance of his duties and within the scope of his employment from disclosing any information concerning the parolee or probationer to any person whenever he deems such disclosure to be appropriate."

This section was transferred to General Statutes § 54-260 in 1999. The only amendment was the deletion of the words "or section 54-102r" in subsection (c) to reflect the repeal of General Statutes (Rev. to 1997) § 54-102r by Public Acts 1998, No. 98-111, § 12.

Hereinafter, all references to § 54-102s are to the 1997 revision of the statute.

[2] General Statutes § 53a-73a provides in relevant part: "Sexual assault in the fourth degree: Class A misdemeanor. (a) A person is guilty of sexual assault in the fourth degree when: (1) Such person intentionally subjects another person to sexual contact who is (A) under fifteen years of age, or (B) mentally defective or mentally incapacitated to the extent that he is unable to consent to such sexual contact, or (C) physically helpless, or (D) less than eighteen years old and the actor is such person's guardian or otherwise responsible for the general supervision of such person's welfare, or (E) in custody of law or detained in a hospital or other institution and the actor has supervisory or disciplinary authority over such other person; or (2) such person subjects another person to sexual contact without such other person's consent; or (3) such person engages in sexual contact with an animal or dead body; or (4) such person is a psychotherapist and subjects another person to sexual contact who is (A) a patient of the actor and the sexual contact occurs during the psychotherapy session, or (B) a patient or former patient of the actor and such patient or former patient is emotionally dependent upon the actor, or (C) a patient or former patient of the actor and the sexual contact occurs by means of therapeutic deception; or (5) such person subjects another person to sexual contact and accomplishes the sexual contact by means of false representation that the sexual contact is for a bona fide medical purpose by a health care professional; or (6) such person is a school employee and subjects another person to sexual contact

utes § 53a-186.[3] When the defendant had entered his plea, the state recounted the following facts as the grounds for conviction. "[T]his defendant, on the date in question, went to the Foodmart shopping store where the victim works. . . . [H]e engaged the victim in a conversation inside, I believe it was, the men's room. . . . [A]t various times, the defendant had contact of a sexual nature with the victim that was not welcomed by the victim at the time. . . . [L]ater, [the defendant] further involved himself with another sexual contact with the victim." The victim's advocate added the following: "The victim lives in a group home. He has constant supervision. He was at [a department of mental retardation] work site when this occurred. He was very distressed over this incident. He said to me that he thought the defendant was his friend. The victim is a very needy [person] who doesn't have a lot of friends. He said he was very fearful when this took place, and although the victim is bigger than the defendant physically, he did not know how to react. He was afraid that the defendant would withdraw his friendship. He was afraid that if he did something to protect himself that he would be arrested. As he said to me, 'I seen that happen on TV, and I didn't want to go to jail.' He was

who is a student enrolled in a school in which the actor works or a school under the jurisdiction of the local or regional board of education which employs the actor. . . ."

General Statutes § 53a-65 (3) defines sexual contact as "any contact with the intimate parts of a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person or any contact of the intimate parts of the actor with a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person."

[3] General Statutes § 53a-186 provides in relevant part: "Public indecency: Class B misdemeanor. (a) A person is guilty of public indecency when he performs any of the following acts in a public place: (1) An act of sexual intercourse as defined in subdivision (2) of section 53a-65; or (2) a lewd exposure of the body with intent to arouse or to satisfy the sexual desire of the person; or (3) a lewd fondling or caress of the body of another person. . . ."

very upset [by] the fact that he had to discuss these incidents with his brother, [who] is a correctional guard, [and] his mother. He was very ashamed to have to say these things that happened to him. He left his job because he couldn't face going back to work at Foodmart. Your Honor, in a warrant, the defendant said to an officer [that] '[h]e promised he wouldn't tell.' I think that says a lot right there, that the victim did not want these incidents to take place, and the victim is mentally handicapped."

The state's attorney then recited the terms of the plea bargain: "The recommendation in this case . . . is eighteen months suspended, three years of probation. [The] conditions of probation are sexual offender evaluation and treatment if deemed necessary by the office of adult probation." The defendant agreed to this plea bargain. The trial court then sentenced the defendant to one year incarceration, execution suspended, three years probation on the fourth degree sexual assault count and six months incarceration, execution suspended, one year probation, on the public indecency count. The defendant's total effective sentence was eighteen months incarceration, execution suspended, three years probation. The trial court imposed the following conditions of probation: sexual offender testing; counseling and treatment deemed appropriate by the department of adult probation; no contact with the victim; and any other conditions imposed by the office of adult probation.[4]

Thereafter, on March 19, 1998, the office of adult probation informed both the court and the defendant that it intended to notify the defendant's neighbors and fellow bowling league participants of the defendant's

---

[4] The written notice apprising the defendant of the conditions of his probation provided: "[I]n addition to those that may be imposed by the Office of Adult Probation . . . sex offender treat, test, eval [and] no contact [with] victim."

conviction. The defendant objected and, through a request for clarification, sought to have the court pass upon this proposed action. On June 8, 1998, the trial court held a hearing to determine whether the office of adult probation had authority to notify members of the community. The court concluded that § 54-102s (c) vested the office of adult probation with discretion to make community notification regarding probationers convicted of any sexual offense, not only those enumerated in subsection (a) of § 54-102s. Accordingly, the court issued an order authorizing community notification. The defendant appealed from this order to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

The defendant argues that § 54-102s is the only authority permitting a probation officer to provide the public with information about a probationer's criminal history. He further asserts that the provisions of § 54-102s authorizing public notification are applicable only when a defendant is convicted of an offense enumerated in subsection (a) of § 54-102s, which the defendant was not.

The state counters that there is no statutory bar to a probation officer apprising the public of the defendant's conviction. The state argues that the authority of the office of adult probation to engage in community notification derives from its general authority to supervise the probationer during the probationary period. The state also argues that if the authority for public notification is derived from § 54-102s, as the trial court concluded, then the plain language of subsection (c) of § 54-102s permits community notification for offenses other than those enumerated in subsection (a) of § 54-102s.

To determine whether the legislature intended to permit the office of adult probation to notify the public of

the defendant's criminal history in this case, we examine the relevant probation statutes; General Statutes (Rev. to 1997) § 53a-30 (a)[5] and General Statutes § 54-108;[6] using well accepted principles of statutory construction. "It is fundamental that statutory construction requires us to ascertain the intent of the legislature and to construe the statute in a manner that effectuates that intent. . . . In seeking to discern that intent, we look

[5] General Statutes (Rev. to 1997) § 53a-30 provides in relevant part: "Conditions of probation and conditional discharge. (a) When imposing sentence of probation or conditional discharge, the court may, as a condition of the sentence, order that the defendant: (1) Work faithfully at a suitable employment or faithfully pursue a course of study or of vocational training that will equip him for suitable employment; (2) undergo medical or psychiatric treatment and remain in a specified institution, when required for that purpose; (3) support his dependents and meet other family obligations; (4) make restitution of the fruits of his offense or make restitution, in an amount he can afford to pay or provide in a suitable manner, for the loss or damage caused thereby and the court may fix the amount thereof and the manner of performance; (5) if a minor, (A) reside with his parents or in a suitable foster home, (B) attend school, and (C) contribute to his own support in any home or foster home; (6) post a bond or other security for the performance of any or all conditions imposed; (7) refrain from violating any criminal law of the United States, this state or any other state; (8) if convicted of a misdemeanor or a felony, other than a capital felony, a class A felony or a violation of section 21a-278, 21a-278a, 53a-55, 53a-56, 53a-56b, 53a-57, 53a-58 or 53a-70b or any offense for which there is a mandatory minimum sentence which may not be suspended or reduced by the court, and any sentence of imprisonment is suspended, participate in an alternate incarceration program; (9) reside in a residential community center or halfway house approved by the Commissioner of Correction, and contribute to the cost incident to such residence; (10) participate in a program of community service labor in accordance with section 53a-39c; (11) if convicted of a violation of subdivision (2) of section 53-21, section 53a-70, 53a-70a, 53a-70b, 53a-71, 53a-72a or 53a-72b, undergo specialized sexual offender treatment; (12) satisfy any other conditions reasonably related to his rehabilitation. The court shall cause a copy of any such order to be delivered to the defendant and to the probation officer, if any. . . ."

Hereinafter, all references to § 53a-30 are to the 1997 revision of the statute.

[6] General Statutes § 54-108 provides in relevant part: "Duties of probation officers. Probation officers shall . . . use all suitable methods to aid and encourage [a probationer] and to bring about improvement in his conduct and condition. . . ."

to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation. . . . We first look to the language of the statute and to the general goals of probation in order to discern the intent of the legislature . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Pieger*, 240 Conn. 639, 646, 692 A.2d 1273 (1997).

In *Pieger*, we held that, "[p]ursuant to § 53a-30 (a), a sentencing court may impose a variety of conditions to a sentence of probation, all of which are aimed at rehabilitating the defendant. . . . [T]he terms of subdivision (12) [of § 53a-30 (a)] are very broad. By allowing the trial court to impose '*any other* conditions reasonably related to [the defendant's] rehabilitation' . . . the legislature authorized the court to impose any condition that would help to secure the defendant's reformation. This broad power is consistent with the goals of probation." (Citation omitted; emphasis in original.) Id., 646–47. "Additionally, because probation is, first and foremost, a penal alternative to incarceration—its objectives are to foster the offender's reformation and to preserve the public's safety—a sentencing court must have the discretion to fashion those conditions of probation it deems necessary to ensure that the individual successfully completes the terms of probation." (Internal quotation marks omitted.) Id., 647. "The success of probation as a correctional tool is in large part tied to the flexibility within which it is permitted to operate." (Internal quotation marks omitted.) *State* v. *Smith*, 207 Conn. 152, 171, 540 A.2d 679 (1988); accord *State* v. *Pieger*, supra, 648. In *Smith*, we observed: "Years ago, the United States Supreme Court said that the purpose of probation is to provide a period of grace in order to aid the rehabilitation of a penitent offender; to take advantage of an opportunity for reformation which

actual service of the suspended sentence might make less probable. *Burns* v. *United States*, 287 U.S. 216, 220, 53 S. Ct. 154, 77 L. Ed. 266 (1932). Accordingly, it emphasized that in administering the probation statute, the trial judge has an exceptional degree of flexibility in determining whether to grant or revoke probation and on what terms." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 164. "To a greater or lesser degree, it is always true of probationers . . . that they do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions. . . . These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." (Citation omitted; internal quotation marks omitted.) Id., 165, quoting *Griffin* v. *Wisconsin*, 483 U.S. 868, 874, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987). We reaffirm the principles of *Pieger* and *Smith*. Furthermore, the plain language of § 54-108 provides, in relevant part, that probation officers shall "use all suitable methods to aid and encourage [a probationer] and to bring about improvement in his [or her] conduct and condition." That language is consistent with the principles of *Pieger* and *Smith*.

In this case, the defendant questioned the authority of the office of adult probation to notify the public, and, after hearing arguments, the trial court specifically authorized the office of adult probation to notify the defendant's immediate neighbors and the local school principal. We conclude that the trial court, under §§ 53a-30 (a) and 54-108, properly upheld the authority of the office of adult probation to give notification as a condition of probation.

"On appeal, the standard of review of an order of probation is whether the trial court abused its discretion. If it appears that the trial court reasonably was

satisfied that the terms of probation had a beneficial purpose consistent with the defendant's reformation and rehabilitation, then the order must stand. . . . In reviewing the issue of discretion, we do so according it every reasonable presumption in favor of the trial court's ruling. *State* v. *Amarillo*, 198 Conn. 285, 313–14, 503 A.2d 146 (1986). [Finally, a] defendant who seeks to reverse the exercise of judicial discretion assumes a heavy burden. . . . *State* v. *Smith*, supra, 207 Conn. 167." (Citations omitted; internal quotation marks omitted.) *State* v. *Pieger*, supra, 240 Conn. 648.

We conclude that the trial court acted within its discretion in permitting the office of adult probation, as a condition of probation, to notify members of the defendant's community "in an attempt to foster the defendant's reformation." Id., 649. The defendant had pleaded guilty to sexual assault in the fourth degree and public indecency in a case involving a mentally impaired victim. The trial court thereafter ordered, under the terms of the plea bargain entered into by the defendant, and as a condition of probation, sexual offender testing, counseling and treatment. Notification to the public was a reasonable component of the defendant's sexual offender treatment. Community notification by the office of adult probation would be a suitable means to "aid and encourage [the defendant] and to bring about improvement in his conduct and condition." General Statutes § 54-108.

In *Roe* v. *Office of Adult Probation*, 125 F.3d 47 (2d Cir. 1997), the Second Circuit Court of Appeals cited the testimony of Michael Santese, Connecticut's deputy director of operations for the office of adult probation, in which he discussed several purposes of community notification: "Certainly, one of the most important is public safety. It enables the recipients [of such notification] to have information that helps to protect them from becoming victims of sexual offenses. . . . [I]t

also enhances the *treatment process.* . . . [Notification] . . . adds to the offender's self-restraints . . . by virtue of the fact that knowing that others out there are aware of his circumstances . . . would act as an inhibitor . . . on [his desire to engage] in any activities that might place [him] at risk of relapse or reoffending." (Emphasis added; internal quotation marks omitted.) Id., 54 n.14. "The main goal [of public notification] is to get the individual successfully through the period of probation without reoffending and have long-term rehabilitative effects." (Internal quotation marks omitted.) Id., 54.

The defendant, on the other hand, argues that only under the authority bestowed by § 54-102s may a probation officer disclose information concerning a sexual offender on probation. The defendant claims that § 54-102s does not apply to him because he is not a "sexual offender," as defined by § 54-102s (a). He argues that the reference in § 54-102s (c) to "the probationer" refers to a "sexual offender" on probation. He argues, therefore, that § 54-102s (c) restricts disclosure to information concerning only that limited class of probationers. We reject this argument.

Section 54-102s (c) is part of Connecticut's "Megan's Law." "On July 29, 1994, Megan Kanka, a seven year old child, was abducted, raped, and murdered near her home. The man who confessed to Megan's murder lived in a house across the street from the Kanka family and had twice been convicted of sex offenses involving young girls. Megan, her parents, local police, and the members of the community were unaware of the accused murderer's history; nor did they know that he shared his house with two other men who had been convicted of sex offenses." *E.B.* v. *Verniero,* 119 F.3d 1077, 1081 (3d Cir. 1997), cert. denied, 522 U.S. 1109, 118 S. Ct. 1039, 140 L. Ed. 2d 105 (1998). Statutes such as § 54-102s "are called 'Megan's Law,' after Megan Kanka,

[whose] sexual assault and murder . . . sparked enactment of sex offender registration and notification statutes in [the state of New Jersey] and several others." *Roe* v. *Office of Adult Probation*, supra, 125 F.3d 48 n.1.

Section 54-102s (c) provides that "[n]othing in this section or section 54-102r[7] shall be construed to prohibit a parole officer or probation officer acting in the performance of his duties and within the scope of his employment from disclosing any information concerning the parolee or probationer to any person whenever he deems such disclosure to be appropriate." Even if we assume that § 54-102s *(c) applies only to those persons* convicted of sexual offenses catalogued in § 54-102s (a), subsection (c) directly provides that § 54-102s does not prohibit a probation officer from disclosing any information about the probationer to any person as the probation officer deems appropriate. We reject the defendant's argument that this grant of broad authority under subsection (c) somehow reveals a legislative intent to remove from probation officers the power to take similar steps concerning probationers convicted of crimes not enumerated in § 54-102s (a). Rather, we read § 54-102s (c) to manifest a legislative intent to ensure that § 54-102s, which requires probation officers to make public notification of changes of address, does not restrict the authority of probation officers to make

[7] General Statutes (Rev. to 1997) § 54-102r consisted of a registration scheme for sex offenders who were going "to be released from the supervision of the Office of Adult Probation upon completion or termination of a sentence of probation or . . . released from a correctional facility"; General Statutes (Rev. to 1997) § 54-102r (b); and required these offenders to provide certain registration information to law enforcement officials. In 1995, § 54-102r had been amended to allow the disclosure of registration information "to any specific person if such disclosure is deemed necessary by the chief of police of the police department or resident state trooper of the municipality to protect said person from any person subject to . . . registration . . . ." General Statutes (Rev. to 1997) § 54-102r (g); see Public Acts 1995, No. 95-142, § 10. In 1998, the legislature repealed § 54-102r effective October 1, 1998. See Public Acts 1998, No. 98-111, § 12.

any other appropriate disclosure to protect prospective victims of those probationers apt to offend again.

The purpose of "Megan's Law" supports our view that § 54-102s does not limit the authority of the office of adult probation to notify the community in cases such as this one. We agree with the Second Circuit Court of Appeals that Connecticut's sex offender registration and notification statutes were enacted "[i]n response to concerns regarding the harm to society caused by sex crimes and the relatively high rate of recidivism among sex offenders . . . ." Id., 48.

Our examination of the language of the statute mandating certain public disclosure, the legislative policy it was designed to implement and its relationship to existing legislation leads us to conclude that the legislature, in enacting § 54-102s, did not intend to restrict the discretionary power of the office of adult probation to notify the public in cases in which the probationer has been convicted under a provision not enumerated in § 54-102s (a). We conclude that the office of adult probation already possessed this power, apart from any provision of § 54-102s, and that it properly exercised that power in this case. If a probation officer determines that public safety will be advanced by community notification, such notification is not prohibited by § 54-102s (c).

The trial court's designation of the defendant as a "sexual offender," as agreed upon in the plea bargain, placed the defendant among those offenders subject to careful supervision by the office of adult probation. The plea bargain provided that, for the period of probation, the defendant would be treated as a sexual offender. In view of the evils to be avoided in the case of sexual predators of children or the mentally impaired, it would stand Megan's Law on its head to hold that § 54-102s prohibits the office of adult probation from warning

potential and vulnerable victims of this defendant's conviction.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and BORDEN, KATZ, PALMER and PETERS, Js., concurred.

BERDON, J., dissenting. The defendant, Donald Misiorski, pleaded guilty to three misdemeanors arising out of a single act of sexual misconduct and public indecency. The defendant's probation officer decided of his own accord that General Statutes (Rev. to 1997) § 54-102s[1] (Megan's Law) authorized him to disclose the facts surrounding the defendant's conviction to, inter alia, the members of the defendant's bowling league. The defendant moved to prevent this humiliation at the hands of his probation officer, but the trial court permitted the disclosure. The majority affirms that decision on the ground that the trial court "properly ordered [disclosure as a] condition of probation." That is not

---

[1] As it read at the time of the defendant's offense, General Statutes (Rev. to 1997) § 54-102s provided: "(a) For the purposes of this section, 'sexual offender' means any person convicted of a violation of subdivision (2) of section 53-21, section 53a-70, section 53a-70a, 53a-70b, 53a-71, 53a-72a or 53a-72b committed on or after October 1, 1995.

"(b) Any sexual offender who is released from a correctional institution on parole or who is sentenced to a period of probation shall, during the period of such parole or probation and as a condition of such parole or probation, immediately notify his parole officer or probation officer, as the case may be, whenever he changes his residence address. Each parole officer or probation officer who is notified of such change of address shall notify the chief of police of the police department or resident state trooper for the municipality of the new address of the parolee or probationer and any other law enforcement official he deems appropriate.

"(c) Nothing in this section or section 54-102r shall be construed to prohibit a parole officer or probation officer acting in the performance of his duties and within the scope of his employment from disclosing any information concerning the parolee or probationer to any person whenever he deems such disclosure to be appropriate."

This section was transferred to General Statutes § 54-260 in 1999 and the words "or section 54-102r" in subsection (c) were deleted to reflect the repeal of General Statutes § 54-102r by Public Acts 1998, No. 98-111.

what happened. In fact, the trial court abdicated all responsibility for the disclosure by holding that Megan's Law "giv[es] the probation or parole authorities *absolute discretion* [to disclose a citizen's criminal record] in any case in which a person has been convicted of [any] sexual offense . . . ."[2] (Emphasis added.) By affirming this ruling, the majority of this court gives probation officers despotic discretion to violate a citizen's privacy arbitrarily and without any judicial review whatsoever.

In the final sentence of its opinion, the majority concludes that Megan's Law does not "[prohibit] the office of adult probation from warning potential and vulnerable victims" of potentially dangerous transgressors. I do not, of course, doubt the legitimacy of the state's power to protect the public. The real question implicated by the present case, however, is whether the state may brand a defendant as a deviant sexual predator *without first according that defendant a meaningful hearing that satisfies the requirements of due process of law.* In my view, this latter question admits of only one answer: the constitution forbids the state from depriving a citizen of his privacy unless it first conducts a rigorous, *judicial* inquiry.

"Traditionally, the extent of process due an individual subject to a possible deprivation of a protected liberty or property interest is analyzed under the framework of *Mathews* v. *Eldridge,* 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)." *Doe* v. *Pataki,* 3 F. Sup. 2d 456, 469 (S.D.N.Y. 1998). In *Mathews,* the United States Supreme Court explained that the determination of what process

---

[2] The majority asserts that " '*the trial judge* has an exceptional degree of flexibility' " to determine the terms of probation. (Emphasis added.) Because the majority authorizes *probation officers* to make disclosures pursuant to Megan's Law, this proposition has nothing to do with the result that the majority has reached.

is due in a particular context "generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [state's] interest . . . ." *Mathews* v. *Eldridge*, supra, 335. I consider each of these factors in turn.

The private interest at stake is of constitutional magnitude, and hence of the highest order. "Constitutional privacy interests are implicated . . . because . . . [t]he damage to [citizens'] reputations resulting from [disclosure] stigmatizes them as currently dangerous sex offenders, can harm their earning capacities, and can cause them to be objects of derision in the community." *Doe* v. *Sex Offender Registry Board*, 428 Mass. 90, 101 n.12, 697 N.E.2d 512 (1998); accord *E.B.* v. *Verniero*, 119 F.3d 1077, 1105–1106 (3d Cir. 1997), cert. denied, 522 U.S. 1109, 118 S. Ct. 1039, 140 L. Ed. 2d 105 (1998); *Doe* v. *Pataki*, supra, 3 F. Sup. 2d 467–68; *Cutshall* v. *Sundquist*, 980 F. Sup. 928, 932 (M.D. Tenn. 1997); *Doe* v. *Poritz*, 142 N.J. 1, 99–107, 662 A.2d 367 (1995).

The risk of an erroneous deprivation when probation officers are deputized to make life shattering decisions under Megan's Law is unacceptably high. Such determinations are the province of judges, not probation officers. Accordingly, "the probable value . . . [of] substitute procedural safeguards"; *Mathews* v. *Eldridge*, supra, 424 U.S. 334;—namely, the requirement of a rigorous, judicial determination before a disclosure may be made—is substantial.

Finally, the state's interest consists of averting theoretical harm that might occur in the absence of prompt notification. This interest well may justify disclosure

that follows close upon the heels of a *prompt* judicial hearing. It cannot, however, possibly be allowed to trump the need for a judicial hearing in the first place.

In my view, my analysis of the *Mathews* factors compels the conclusion that a judicial hearing must be conducted before any disclosures may be made pursuant to Megan's Law. This conclusion comports with the holdings of a number of well reasoned opinions from highly respected courts. See, e.g., *E.B.* v. *Verniero*, supra, 119 F.3d 1105–1106; *Doe* v. *Pataki*, supra, 3 F. Sup. 2d 471–72; *Doe* v. *Sex Offender Registry Board*, supra, 428 Mass. 101 n.12; *Doe* v. *Poritz*, supra, 142 N.J. 107. These courts have also addressed the sensitive question of how, precisely, the state should balance a citizen's right to privacy against the perceived need to invade that privacy through disclosure pursuant to Megan's Law. Drawing upon the work of these courts, I would hold that: (1) a judicial hearing is required; (2) the defendant is entitled to legal representation at this hearing; (3) the state must furnish an attorney to a defendant who cannot afford one; (4) the state must prove, by clear and convincing evidence, that disclosure is necessary to prevent a substantial likelihood of grave harm; and (5) the defendant is entitled to assert an appeal as of right before his criminal record may be exposed to members of his community.

I recognize that the nightmarish regime created by the majority is not inconsistent with the text of Megan's Law.[3] That said, the statute does not address the mechanics of disclosing a defendant's criminal record to the community. Accordingly, the statute does not

---

[3] The relevant text of Megan's Law provides: "Nothing in this section . . . shall be construed to prohibit a parole officer or probation officer acting in the performance of his duties and within the scope of his employment from disclosing any information concerning the parolee or probationer to any person whenever he deems such disclosure to be appropriate." General Statutes (Rev. to 1997) § 54-102s (c).

foreclose the possibility of a rigorous, judicial hearing prior to branding a defendant as a deviant sexual predator. To the extent that this interpretation is mistaken, then Megan's Law is unconstitutional as it was applied to the facts of the present case.

"Because statutory construction is informed by the presence of constitutional infirmities, this court reads statutes so as to avoid, rather than to create, constitutional questions. *In re Valerie D.*, 223 Conn. 492, 534, 613 A.2d 748 (1992). More specifically, [i]n choosing between two statutory constructions, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent. . . . *In re Baby Girl B.*, 224 Conn. 263, 286, 618 A.2d 1 (1992). By refusing to acknowledge the unconstitutional consequences of the decision it renders today, the majority performs an end run around this basic axiom of statutory construction." (Internal quotation marks omitted.) *In re Baby Z.*, 247 Conn. 474, 561, 724 A.2d 1035 (1999) (*Berdon, J.*, dissenting).

In short, the majority's grant of fascistic powers to probation officers cuts away a pound of flesh from the constitutional right to privacy. Accordingly, I dissent.